UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-cv-22639-RAR

MATTHEW S. ATTALLA, an individual; and
BOXR STUDIOS LLC, a Florida Limited Liability
Company,

   *Plaintiffs,*

vs.

MATTHEW LEE MORGAN, an individual;
MATTHEW LEE MORGAN as trustee of the
MATTHEW LEE MORGAN TRUST; CRAIG
BRIDGMAN, an individual; CAMBRIDGE
CAPITAL OF MIAMI, LLC, a Florida Limited
Liability Company; BOXR HOLDING, INC., a
Delaware Limited Liability Company; and BOXR
HOLDING, LLC, a Delaware Limited Liability
Corporation,,

   *Defendants.*

_____/

## DEFENDANTS' COUNTERCLAIMS AND ANSWER
## WITH AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT

Defendants Matthew Lee Morgan ("Morgan"), in his individual capacity and as Trustee of

the Matthew Lee Morgan Trust under agreement dated September 26, 2018 (the "Trust"), Craig

Bridgman, an individual ("Bridgman"), Cambridge Capital of Miami, LLC, a Florida Limited

Liability Company ("Cambridge"), BOXR Holding, Inc., a dissolved Delaware Corporation

("BOXR Inc."), and BOXR Holding, LLC, a Delaware Limited Liability Company ("BOXR

Holding" and together with Morgan, the Trust, Bridgman, Cambridge, and BOXR Inc.,

"Counterclaim-Plaintiffs" or "Defendants"), by and through their undersigned counsel, as and for

their Counterclaims and Answer with Affirmative Defenses (the "Answer") to the Complaint filed

by Plaintiffs Matthew S. Attalla ("Attalla") and BOXR Studios, LLC, a Florida Limited Liability

Company ("BOXR Studios", and together with Attalla, the "Attalla Parties", "Counterclaim-Defendants", or "Plaintiffs"), dated June 11, 2025 (the "Complaint"), state and allege as follows:[1]

1.      The allegations contained in Paragraph 1 of the Complaint purport to summarize the content of the Complaint, which is a document that speaks for itself.  To the extent the allegations are inconsistent with the Complaint, those allegations are denied.

## PARTIES AND JURISDICTION

2.      Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 of the Complaint.

3.      Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 3 of the Complaint.

4.      Defendants admit the allegations contained in Paragraph 4 of the Complaint.

5.      Defendants admit the allegations contained in Paragraph 5 of the Complaint.

6.      Defendants deny the allegations contained in Paragraph 6 of the Complaint, except admit that Bridgman is a natural person.

7.      Defendants admit the allegations contained in Paragraph 7 of the Complaint.

8.      Defendants deny the allegations contained in Paragraph 8 of the Complaint.

9.      Defendants admit the allegations contained in Paragraph 9 of the Complaint.

10.      The allegations contained in Paragraph 10 of the Complaint purport to state a legal conclusion to which no response is necessary.  To the extent a response is required, Defendants deny the allegations contained in Paragraph 10 of the Complaint.

11.      The allegations contained in Paragraph 11 of the Complaint purport to state a legal

---

[1] Defendants hereby deny any allegations or implications contained in headings, headers, footnotes, unnumbered paragraphs, and/or the prayer for relief in the Complaint.

conclusion to which no response is necessary. To the extent a response is required, Defendants deny the allegations contained in Paragraph 11 of the Complaint.

12. The allegations contained in Paragraph 12 of the Complaint purport to state a legal conclusion to which no response is necessary. To the extent a response is required, Defendants deny the allegations contained in Paragraph 12 of the Complaint.

13. The allegations contained in Paragraph 13 of the Complaint purport to state a legal conclusion to which no response is necessary. To the extent a response is required, Defendants deny the allegations contained in Paragraph 13 of the Complaint.

14. The allegations contained in Paragraph 14 of the Complaint purport to state a legal conclusion to which no response is necessary. To the extent a response is required, Defendants deny the allegations contained in Paragraph 14 of the Complaint.

15. The allegations contained in Paragraph 15 of the Complaint purport to state a legal conclusion to which no response is necessary. To the extent a response is required, Defendants deny the allegations contained in Paragraph 15 of the Complaint.

## NATURE OF THE ACTION

### *Attalla – Creator, Owner and Founder of BOXR*

16. Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 of the Complaint.

17. Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 of the Complaint.

18. Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 of the Complaint.

19. Defendants deny having knowledge or information sufficient to form a belief as to

3

the truth of the allegations contained in Paragraph 19 of the Complaint.

20. Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 of the Complaint.

21. Defendants deny that Attalla or BOXR Studios own any BOXR "mark," a fact which Attalla is well aware of given that he assisted with BOXR Inc.'s application for the BOXR mark. Defendants deny having sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 21 of the Complaint.

22. Defendants admit that Attalla initially operated in a "small" studio but deny having knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 22.

23. Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 23 of the Complaint, except deny that Attalla or BOXR Studios own any BOXR "mark". By way of further response, Defendants incorporate their answer to Paragraph 21 of the Complaint.

24. Defendants admit the allegations in Paragraph 24 of the Complaint.

25. Defendants deny the allegations contained in Paragraph 25 of the Complaint, except admit that from the time Morgan and Attalla met, they intended to form a joint venture.

26. Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26 of the Complaint, except deny that Attalla "found" the warehouse and that Attalla or BOXR Studios own any BOXR "brand" or "mark".

27. Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 27 of the Complaint, except admit that Morgan offered his assistance to Attalla because they intended to (and did) enter into a joint venture.

28. Defendants deny the allegations contained in Paragraph 28 of the Complaint, except admit that Morgan offered to fund the joint venture and that Morgan set up a meeting between Attalla and himself.

29. Defendants deny the allegations contained in Paragraph 29 of the Complaint.

30. Defendants deny the allegations contained in Paragraph 30 of the Complaint, except admit that Morgan, through his entities, and Cambridge funded a total of $824,968 to the joint venture. They provided this capital, whenever Attalla requested it to, *inter alia*, help develop and construct the joint venture's gym and solicit new business for the gym.

31. Defendants deny the allegations contained in Paragraph 31 of the Complaint except admit that Morgan handled the lease negotiations. Defendants further state that Attalla was involved in the negotiations for the lease and signed the lease on behalf of BOXR Gym as a director of BOXR Inc. Defendants further state that certain allegations contained in Paragraph 31 of the Complaint purport to characterize a lease between Gypsy K, LLC and BOXR Gym, LLC (the "Lease"), which is a document that speaks for itself. To the extent the allegations contained in Paragraph 31 of the Complaint are inconsistent with the content of the Lease, those allegations are denied.

32. Defendants deny the allegations contained in Paragraph 32 of the Complaint except admit that Attalla and Morgan both signed the Lease as Directors of BOXR Inc., and that Attalla and Morgan are identified in the Lease as guarantors of BOXR Gym's obligations.

33. Defendants deny the allegations contained in Paragraph 33 of the Complaint, except admit that Morgan (through his entities) and Cambridge paid for the gym buildout and other expenses.

34. Defendants deny the allegations contained in Paragraph 34 of the Complaint.

5

35.     Defendants deny the allegations contained in Paragraph 35 of the Complaint.

36.     The allegations contained in Paragraph 36 of the Complaint purport to characterize the Lease Addendum, which is a document that speaks for itself.  To the extent the allegations contained in Paragraph 36 of the Complaint are inconsistent with the content of the Lease Addendum, those allegations are denied.

37.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37 of the Complaint, except admit that the gym opened on or around April 11, 2022, and that the gym experienced success.

38.     The allegations contained in Paragraph 38 of the Complaint purport to characterize the Second Lease Addendum, which is a document that speaks for itself.  To the extent the allegations contained in Paragraph 38 of the Complaint are inconsistent with the content of the Second Lease Addendum, those allegations are denied.

39.     Defendants deny the allegations contained in Paragraph 39 of the Complaint, except admit that Defendants sent Attalla a series of written agreements memorializing the terms of the joint venture that they had previously agreed to.  Defendants further state that the allegations in Paragraph 39 of the Complaint purport to characterize those written agreements memorializing the terms of the joint venture, which are documents that speak for themselves.  To the extent the allegations contained in Paragraph 39 of the Complaint are inconsistent with the content of those documents, those allegations are denied.

40.     Defendants deny the allegations contained in Paragraph 40 of the Complaint.

41.     Defendants deny the allegations contained in Paragraph 41 of the Complaint, except admit that Defendants received certain payments from Attalla.

42.     Defendants deny the allegations contained in Paragraph 42 of the Complaint, except

6

admit that Defendants received certain payments from Attalla.

43.     The allegations contained in Paragraph 43 of the Complaint purport to characterize certain receipts, which are documents that speak for themselves.  To the extent the allegations contained in Paragraph 43 of the Complaint are inconsistent with the content of those documents, those allegations are denied.

44.     Defendants deny the allegations contained in Paragraph 44 of the Complaint, except admit that Defendants received certain payments from Attalla.

45.     The allegations contained in Paragraph 45 of the Complaint purport to characterize the Third Lease Addendum, which is a document that speaks for itself.  To the extent the allegations contained in Paragraph 45 of the Complaint are inconsistent with the content of the Third Lease Addendum, those allegations are denied.

46.     The allegations contained in Paragraph 46 of the Complaint purport to characterize a letter from Major Umset Ramos of the Miami Police Department (the "Ramos Letter"), which is a document that speaks for itself.  To the extent the allegations contained in Paragraph 46 of the Complaint are inconsistent with the content of the Ramos Letter, those allegations are denied.

47.     The allegations contained in Paragraph 47 of the Complaint purport to characterize a letter from Lieutenant Kevin Ruggiero of the City of Miami Police Department (the "Ruggiero Letter"), which is a document that speaks for itself.  To the extent the allegations contained in Paragraph 47 of the Complaint are inconsistent with the content of the Ruggiero Letter, those allegations are denied.

48.     The allegations contained in Paragraph 48 of the Complaint purport to characterize a letter from Mayor Francis Suarez (the "Suarez Letter"), which is a document that speaks for itself.  To the extent the allegations contained in Paragraph 48 of the Complaint are inconsistent

7

with the content of the Suarez Letter, those allegations are denied.

49.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 49 of the Complaint.

***The Conspiracy, Theft of Attalla's Common Law BOXR Trademark, Theft of the Leases Under Which Attalla Runs his Business, and Attempted Theft of Attalla's Brand and Goodwill***

50.     Defendants deny the allegations contained in Paragraph 50 of the Complaint.

51.     Defendants deny the allegations contained in Paragraph 51 of the Complaint, except admit that Cambridge was registered in the State of Florida on March 4, 2021.

52.     Defendants deny the allegations contained in Paragraph 52 of the Complaint.

53.     Defendants deny the allegations contained in Paragraph 53 of the Complaint.

54.     Defendants deny the allegations contained in Paragraph 54 of the Complaint, except admit that on August 19, 2021, BOXR Inc. submitted an application for the BOXR mark, and that the application is a document which speaks for itself.

55.     Defendants deny the allegations contained in Paragraph 55 of the Complaint, except admit that Attalla knew about the application for the BOXR mark since August 2021 (at the latest).

56.     Defendants deny the allegations contained in Paragraph 56 of the Complaint.

57.     Defendants deny the allegations contained in Paragraph 57 of the Complaint, except to the extent the allegations purport to refer to the content of the USPTO Application, which is a document that speaks for itself.  To the extent the allegations contained in Paragraph 57 of the Complaint are inconsistent with the content of the USPTO Application, those allegations are denied.

58.     Defendants deny the allegations contained in Paragraph 58 of the Complaint, except to the extent the allegations purport to refer to the content of the USPTO Application, which is a document that speaks for itself.  To the extent the allegations contained in Paragraph 58 of the

8

Complaint are inconsistent with the content of the USPTO Application, those allegations are denied.

59.     Defendants deny the allegations contained in Paragraph 59 of the Complaint, except to the extent the allegations purport to refer to the content of the USPTO Application, which is a document that speaks for itself.  To the extent the allegations contained in Paragraph 59 of the Complaint are inconsistent with the content of the USPTO Application, those allegations are denied.

60.     Defendants deny the allegations contained in Paragraph 60 of the Complaint, except admit that BOXR Holding was formed on December 14, 2021.

61.     Defendants deny the allegations contained in Paragraph 61 of the Complaint.

62.     Defendants deny the allegations contained in Paragraph 62 of the Complaint except to the extent they purport to characterize a Joint Written Action of the Sole Member and Manager, dated December 15, 2021 (the "Joint Written Action"), which is a document that speaks for itself. To the extent the allegations contained in Paragraph 62 of the Complaint are inconsistent with the content of the Joint Written Action, those allegations are denied.

63.     Defendants deny the allegations contained in Paragraph 63 of the Complaint except to the extent they purport to characterize an Assignment Separate from Certificate, dated December 15, 2021 (the "December Assignment"), which is a document that speaks for itself.  To the extent the allegations contained in Paragraph 63 of the Complaint are inconsistent with the content of the December Assignment, those allegations are denied.

64.     Defendants deny the allegations contained in Paragraph 64 of the Complaint except to the extent they purport to characterize an Assignment, dated March 9, 2022 (the "March Assignment"), which is a document that speaks for itself.  To the extent the allegations contained

9

in Paragraph 64 of the Complaint are inconsistent with the content of the March Assignment, those allegations are denied.

65.     The allegations contained in Paragraph 65 of the Complaint purport to characterize a proposed trademark assignment (the "Trademark Assignment"), which is a document that speaks for itself.  To the extent the allegations contained in Paragraph 65 of the Complaint are inconsistent with the content of the Trademark Assignment, those allegations are denied.

66.     Defendants admit the allegations contained in Paragraph 66 of the Complaint.

67.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 67 of the Complaint.

68.     Defendants deny the allegations contained in Paragraph 68 of the Complaint except to the extent they purport to characterize certain correspondence Attalla received from the USPTO, which are documents that speak for themselves.

69.     Defendants deny the allegations contained in Paragraph 69 of the Complaint.

70.     Defendants deny the allegations contained in Paragraph 70 of the Complaint, except admit that the parties engaged in settlement negotiations prior to this lawsuit being commenced. Defendants further deny having knowledge or information sufficient to form a belief as to the truth regarding what Attalla began "looking into."

71.     Defendants deny the allegations contained in Paragraph 71 of the Complaint, except admit that the parties engaged in settlement negotiations prior to this lawsuit being commenced. Defendants further deny having knowledge or information sufficient to form a belief as to the truth regarding what Attalla began "looking into."

72.     Defendants deny the allegations contained in Paragraph 72 of the Complaint, except admit that the parties engaged in settlement negotiations prior to this lawsuit being commenced.

73. Defendants deny the allegations contained in Paragraph 73 of the Complaint, except admit that Attalla paid Kuvera and Cambridge $820,000. Defendants further state that they deny having knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 73 of the Complaint.

74. The allegations contained in Paragraph 74 of the Complaint purport to characterize a letter from Cambridge, which is a document that speaks for itself. To the extent the allegations contained in Paragraph 74 of the Complaint are inconsistent with the content of that letter, those allegations are denied.

75. Defendants deny the allegations contained in Paragraph 75 of the Complaint.

### COUNT I: FRAUDULENT REGISTRATION PURSUANT TO 15 § U.S.C. 1120

**(Against Morgan, BOXR Holding, Inc., Morgan as Trustee, Craig Bridgman, Cambridge Capital and BOXR Holding, LLC)**

76. Defendants repeat and reallege those assertions contained in Paragraphs 1 through 75 above, as if fully set forth herein.

77. The content of Paragraph 77 purports to set forth the relief Plaintiffs seek through the Complaint, for which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 77 of the Complaint.

78. The allegations contained in Paragraph 78 of the Complaint purport to state a legal conclusion to which no response is necessary. To the extent a response is required, Defendants deny the allegations contained in Paragraph 78 of the Complaint.

79. Defendants deny the allegations contained in Paragraph 79 of the Complaint.

80. Defendants deny the allegations contained in Paragraph 80 of the Complaint.

81. Defendants deny the allegations contained in Paragraph 81 of the Complaint.

82. Defendants deny the allegations contained in Paragraph 82 of the Complaint.

83.     Defendants deny the allegations contained in Paragraph 83 of the Complaint.

84.     Defendants deny the allegations contained in Paragraph 84 of the Complaint, except admit that the mark was transferred from BOXR Inc. to BOXR Holding.

85.     Defendants deny the allegations contained in Paragraph 85 of the Complaint, except admit that the USPTO granted the mark to BOXR Holding.

86.     Defendants admit the allegations contained in Paragraph 86 of the Complaint.

87.     Defendants deny the allegations contained in Paragraph 87 of the Complaint.

88.     Defendants deny the allegations contained in Paragraph 88 of the Complaint.

89.     Defendants deny the allegations contained in Paragraph 89 of the Complaint.

### COUNT II: Declaration of Service Mark Ownership
**(Against all Defendants)**

90.     Defendants repeat and reallege those assertions contained in Paragraphs 1 through 89 above, as if fully set forth herein.

91.     Defendants deny the allegations contained in Paragraph 91 of the Complaint except Defendants deny having knowledge or information sufficient to form a belief as to the manner in which Attalla allegedly used BOXR in commerce.

92.     Defendants deny the allegations contained in Paragraph 92 of the Complaint.

93.     Defendants deny the allegations contained in Paragraph 93 of the Complaint.

94.     Defendants deny the allegations contained in Paragraph 94 of the Complaint.

95.     Defendants deny the allegations contained in Paragraph 95 of the Complaint.

96.     Defendants deny the allegations contained in Paragraph 96 of the Complaint.

97.     The allegations contained in Paragraph 97 of the Complaint purport to state a legal conclusion to which no response is necessary.  To the extent a response is required, Defendants deny the allegations contained in Paragraph 97 of the Complaint.

98.     The allegations contained in Paragraph 98 of the Complaint purport to state a legal conclusion to which no response is necessary.  To the extent a response is required, Defendants deny the allegations contained in Paragraph 98 of the Complaint.

99.     Defendants deny the allegations contained in Paragraph 99 of the Complaint.

100.     The allegations contained in Paragraph 100 of the Complaint purport to state a legal conclusion to which no response is necessary.  To the extent a response is required, Defendants deny the allegations contained in Paragraph 100 of the Complaint.

101.     The allegations contained in Paragraph 101 of the Complaint purport to state a legal conclusion to which no response is necessary.  To the extent a response is required, Defendants deny the allegations contained in Paragraph 101 of the Complaint.

102.     The allegations contained in Paragraph 102 of the Complaint purport to state a legal conclusion to which no response is necessary.  To the extent a response is required, Defendants deny the allegations contained in Paragraph 102 of the Complaint.

103.     Defendants deny the allegations contained in Paragraph 103 of the Complaint.

104.     The allegations contained in Paragraph 104 of the Complaint purport to state a legal conclusion to which no response is necessary.  To the extent a response is required, Defendants deny the allegations contained in Paragraph 104 of the Complaint.

### COUNT III: Fraudulent Misrepresentation
**(Against Morgan and Bridgman)**

105.     Defendants repeat and reallege those assertions contained in Paragraphs 1 through 104 above, as if fully set forth herein.

106.     Defendants deny the allegations contained in Paragraph 106 of the Complaint.

107.     Defendants deny the allegations contained in Paragraph 107 of the Complaint.

108.     Defendants deny the allegations contained in Paragraph 108 of the Complaint.

109.    Defendants deny the allegations contained in Paragraph 109 of the Complaint.

110.    Defendants deny the allegations contained in Paragraph 110 of the Complaint.

111.    Defendants deny the allegations contained in Paragraph 111 of the Complaint.

### COUNT IV: Conspiracy to Commit Fraud
### (Against Morgan and Bridgman)

112.    Defendants repeat and reallege those assertions contained in Paragraphs 1 through 111 above, as if fully set forth herein.

113.    Defendants deny the allegations contained in Paragraph 113 of the Complaint.

114.    Defendants deny the allegations contained in Paragraph 114 of the Complaint.

115.    Defendants deny the allegations contained in Paragraph 115 of the Complaint.

116.    Defendants deny the allegations contained in Paragraph 116 of the Complaint.

117.    Defendants deny the allegations contained in Paragraph 117 of the Complaint.

### AFFIRMATIVE DEFENSES

### First Affirmative Defense

1.    Plaintiffs' claims are barred, in whole or in part, by documentary evidence.

### Second Affirmative Defense

2.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

### Third Affirmative Defense

3.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

### Fourth Affirmative Defense

4.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of unconscionability.

### Fifth Affirmative Defense

14

5.      Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' own acts and/or omissions.

## Sixth Affirmative Defense

6.      Plaintiffs' claims are barred, in whole or in part, by their failure to state a claim.

## Seventh Affirmative Defense

7.      Plaintiffs' claims are barred, in whole or in part, by virtue of their own breaches of the agreements and/or venture between the parties.

## Eighth Affirmative Defense

8.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of unjust enrichment.

## Ninth Affirmative Defense

9.      Plaintiffs' claims are barred, in whole or in part, by a lack of damages.

## Tenth Affirmative Defense

10.     Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

## Eleventh Affirmative Defense

11.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

## Twelfth Affirmative Defense

12.     Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' fraudulent conduct.

## Thirteenth Affirmative Defense

13.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

## Fourteenth Affirmative Defense

14.     Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' failure to mitigate their alleged damages.

**Reservation of Right to Assert Additional Affirmative Defenses**

15.     The Complaint contains insufficient information to permit Defendants to raise all appropriate defenses, and Defendants therefore reserve the right to amend and/or supplement this answer with additional defenses based on facts learned through discovery.

**COUNTERCLAIMS**

Counterclaim-Plaintiffs, by and through their undersigned counsel, as and for their Counterclaims against the Attalla Parties, state and allege as follows:

**NATURE OF THE ACTION**

1.     This action for compensatory damages, punitive damages, and equitable relief arises out of the Attalla Parties' bad faith conduct and breaches of their fiduciary obligations with respect to the joint venture (the "Joint Venture") formed by Attalla, Morgan, and Bridgman (the "Founding Parties"), which operates a boxing and fitness facility in Miami.

2.     In the summer of 2021, Attalla and Morgan met through a mutual friend. Attalla had a fledgling fitness facility in a small studio space in Miami, at which he was teaching boxing and fitness classes. At the time, Attalla had formed BOXR Studios LLC (the entity, "BOXR Studios") but had not applied for any trademark in connection with the BOXR name.

3.     Morgan and Attalla became fast friends, and Morgan introduced Attalla to Bridgman, who is a successful investor. The three men then decided to form the Joint Venture to develop a boxing and fitness business under the name "BOXR."

16

4.      The parties contemplated that Morgan and Bridgman (through their entities)[2] would provide the capital necessary to grow and develop the Joint Venture, while Attalla would serve as the operating partner and CEO. Based on these contributions, the three further agreed to their respective ownership shares of the Joint Venture – Morgan (through the Trust) and Bridgman (through Cambridge) would each be given thirty percent (30%) of the Joint Venture, while Attalla would be given forty percent (40%).

5.      Consistent with this agreement, in August of 2021, the Founding Parties took steps to formalize the Joint Venture.  Among other things, the Founding Parties (i) registered BOXR Holding, Inc. ("BOXR Inc.") with the Delaware Department of State on August 9, 2021, and (ii) formed BOXR Gym LLC ("BOXR Gym") as a wholly owned subsidiary of BOXR Inc. Attalla – as a stockholder and director of BOXR Inc. – *signed the formation documents* for BOXR Inc. and executed the formation documents for BOXR Gym.

6.      In or around this same time period, Morgan led the negotiations for a lease agreement for BOXR Gym (the "Lease") to secure a larger (and ideally located) facility for the gym (the "Gym") to operate.  As a director of BOXR Inc., Attalla signed the Lease where the Gym still operates to this day. Moreover, Morgan personally guaranteed BOXR Gym's obligations under the Lease.

7.      In connection with formalizing the Joint Venture, the Founding Parties also caused BOXR Inc. to take steps to register a trademark for "BOXR" (the "Mark").  Attalla and Morgan both coordinated with BOXR Inc.'s intellectual property counsel to cause BOXR Inc. to submit an application to the USPTO to register the Mark.  To that end, Attalla (i) told BOXR Inc.'s counsel

---

[2] Morgan, Bridgman, Cambridge, and the Trust shall be collectively referred to herein as the "Majority Partners".

that the Mark had been in use since November 2020, and (ii) agreed that BOXR Inc. would own the Mark.

8.      Soon thereafter, the Founding Parties began working on a stockholder agreement to reflect their equity in BOXR Inc.  Attalla had expressed concerns over his citizenship status (as, upon information and belief, Attalla did not have authorization to work in the country) and how being listed as an owner of the corporation could jeopardize his citizenship.  To accommodate Attalla (and avoid running the risk of the Joint Venture's CEO being deported), the Founding Parties agreed to hold off on memorializing the Joint Venture.

9.      Nevertheless, the parties agreed that they needed to have an entity – and have a fully executed operating agreement – to hold BOXR Gym (as the tenant on the Lease) and prosecute the Mark with the USPTO. Thus, the Founding Parties agreed on a new plan of action. Specifically, they set up BOXR Holding, LLC ("BOXR Holding") to be the holding company for the Mark and the Lease (via BOXR Gym), and this time listed Morgan (through his Trust) and Bridgman (through his entity Cambridge) as the owners of that company.  The parties agreed to leave Attalla off the cap table of BOXR Holding to alleviate Attalla's purported concerns about his citizenship status.  But the Founding Parties agreed that nothing would change with respect to the Joint Venture – Attalla would continue in his role as the CEO of the Joint Venture.   And once Attalla's citizenship issues were resolved, the Founding Parties would memorialize the Joint Venture.

10.      Attalla was fully aware of, and approved of, this new plan – namely, that the parties would form BOXR Holding and then transfer BOXR Gym and the Mark to BOXR Holding.  Based upon the parties' understanding, the Founding Parties began to build the business, and Attalla frequently contacted the Majority Partners for funds, which the Majority Partners provided.  In

total, the Majority Partners provided $845,837.00 to the Joint Venture.  These funds were crucial to the development of the Joint Venture and were largely used to construct the Gym.

11.     Moreover, the Majority Partners routinely guaranteed payment obligations on behalf of the Joint Venture. By way of example, Morgan and Bridgman personally guaranteed the Gym's payment obligations under (i) equipment leases, and (ii) the Lease, resulting in the two personally being liable for millions of dollars on BOXR Gym's behalf. The Majority Partners were willing to do this because they were equity investors in the Joint Venture, and their operator – Attalla – claimed to be an unauthorized citizen (and thus had no credit).

12.     In addition to providing the requisite capital, the Majority Partners also (i) provided a sophisticated team to help grow and develop the Joint Venture, (ii) attended business meetings for potential partnerships, and (iii) helped solicit new clients for the Gym. Put simply, the Majority Partners acted as co-venturers in the Joint Venture – and Attalla relied on them to do that, because they were all owners of the business.

13.     In the summer of 2022, the Majority Partners asked Attalla to memorialize the Joint Venture, as the BOXR business was growing and the Majority Partners were concerned about moving forward without definitive documentation.  Thus, the Founding Parties – including Attalla – began to work on the necessary documents.  But when it came time to execute them, Attalla again cited his alleged concern over his citizenship status and requested that the parties continue to hold off.  The Majority Partners reluctantly agreed to proceed without memorializing the Joint Venture in an effort to help Attalla.

14.     For the next several months, nothing changed.  The business continued to grow.  And the Founding Parties continued to behave as Joint Venture partners.  But in 2023, things

changed.  Attalla started to claim that the Majority Partners were not entitled to any ownership of the BOXR business.

15.     Moreover, Attalla was keeping all of the proceeds from the Gym to himself, while making no distributions to the Majority Partners (despite acknowledging that they were "investors" entitled to "distributions").

16.     Attalla justified his position by pointing to the lack of any documentation reflecting the Majority Partners' ownership of the business.  The Majority Partners were shocked by Attalla's position given that the parties had agreed not to memorialize their partnership due solely to Attalla's alleged concerns about his citizenship (which, upon information and belief, now appear to have been disingenuous (at best) when made). Regardless, given Attalla's position, the Majority Partners attempted to negotiate a business divorce with Attalla.

17.     Attalla then started making monthly payments to the Majority Partners.  But in 2024, he stopped paying.  To make matters worse, Attalla is now attempting to use the lack of any definitive documents to support his claims that the Joint Venture never existed, calling the Majority Partners mere lenders with no ownership rights in the business.  Meanwhile, Attalla is still collecting all of the profits from the Gym – which, on the backs of the Founding Parties (and due largely to the efforts of the Majority Partners) has grown substantially and now has at least 3,000 members paying, upon information and belief, $199 a month for their membership - and keeping them to himself.

18.     Attalla's conduct is egregious (to say the least).  As the CEO of the Joint Venture, Attalla has breached his fiduciary duties to the Joint Venture by, among other things, taking (or otherwise diverting) the Joint Venture's assets for his own use and excluding the Majority Partners from the fruits of the business.

20

19.     Upon information and belief, Attalla has since "sold" the Majority Partners' stake in the Joint Venture without the Majority Partners' knowledge or consent.  And, tellingly, upon information and belief Attalla has cited his same alleged citizenship concerns as an excuse to avoid executing his agreements with other individuals, as others have made similar allegations against Attalla in (at least) one other litigation.

20.     Worst of all, Attalla has done all of this notwithstanding the fact that the Majority Partners have not only provided the requisite capital for the Joint Venture's success, but also at times ***personally guaranteed*** the Gym's payment obligations. The notion that Morgan and Bridgman would place their personal net worth on the line for a mere 'borrower' defies all common sense.

21.     Accordingly, Counterclaim-Plaintiffs now seek (i) a declaration that the Founding Parties formed the Joint Venture, and that the Joint Venture owns the Mark, (ii) money damages in an amount to be determined at trial but in no event less than $25,000,000, (iii) costs and expenses, including attorneys' fees, (iv) punitive damages, and (v) such other relief as the Court deems just and proper.

## PARTIES COMMON TO THE COUNTERCLAIMS

22.     Morgan is an individual residing in the state of Nevada.  He is also a trustee of the Trust.

23.     Bridgman is an individual residing in Dubai, United Arab Emirates.

24.     Cambridge a Florida Limited Liability Company, with a principal address at 3350 Mary Street, Miami, Florida 33133

25.     BOXR Inc. is a Delaware corporation that has been dissolved and is not active.

26.     BOXR Holding is a Delaware limited liability company having its principal place of business at 1310 E. lst Avenue, Miami FL 33132 (*i.e.*, the property at which the Gym operates,

21

the "Property").  BOXR Holding is the sole member of BOXR Gym, which is the "Tenant" under the Lease for the Property at which the Gym is operated.

27.     Upon information and belief, Counterclaim-Defendant Attalla is an individual residing in the state of Florida.

28.     Upon information and belief, Counterclaim-Defendant BOXR Studios is a Florida Limited Liability Company with its principal address at 1310 E. lst Avenue, Miami FL 33132.

### FACTS UNDERLYING THE COUNTERCLAIMS

*The Founding Parties Meet and Create the Joint Venture, forming BOXR Inc.*

29.     In or around spring 2021, Morgan met Attalla through a mutual friend.

30.     Attalla had a fledgling fitness business at a 5,000 square foot studio space, at which he was providing boxing and fitness classes.

31.     While Attalla had formed BOXR Studios, he had not submitted any applications to register any trademark for the BOXR brand (whether with the USPTO or with any state authority).

32.     Soon thereafter, Morgan and Attalla began discussing the beginnings of the Joint Venture, whereby they would work together to develop a fitness and boxing business.

33.     Morgan informed Attalla that he knew a trusted investor, Bridgman, who would be interested in joining the contemplated venture and could provide additional financial support along with Morgan.

34.     Bridgman is an  experienced and successful investor  (a fact known to Attalla).

35.     Ultimately, the Founding Parties agreed to form the Joint Venture, whereby Morgan and Bridgman – through their entities - would provide the capital and business acumen to develop this fitness/boxing business, and Attalla would operate it.

36. To form the Joint Venture, the Founding Parties agreed that they would form a holding company to own the various entities that would be needed to properly run the BOXR business.

37. Attalla agreed that once the holding company was created, he would assign BOXR Studios to the holding company.

38. For providing the capital and business acumen to grow and develop the Joint Venture, Morgan and Cambridge each received thirty percent (30%) of the BOXR business.

39. Attalla received the remining forty percent (40%) to reflect his past, present, and future sweat equity.

40. Consistent with their agreed-upon plan, the Founding Parties caused BOXR Inc. to be formed in August 2021 and agreed that BOXR Inc. would serve as the holding company for the Joint Venture.

41. Morgan (through his entity "Fractured Holdings") and Attalla were the initial stockholders and directors of BOXR Inc.

42. On August 9, 2021, the Founding Parties registered BOXR Inc. with the Delaware Department of State.

43. Attalla was copied on the vast majority of the communications regarding the formation of BOXR Inc.

44. Moreover, both Morgan and Attalla executed documents in connection with forming BOXR Inc.

45. For example, on August 10, 2021, Morgan and Attalla signed a "Unanimous Written Consent of the Stockholders" (the "Written Consent") on behalf of BOXR Inc.

46.     The first WHEREAS clause in the Written Consent states that "the organizer of the Corporation, acting as the sole incorporator of the Corporation (the 'Sole Incorporator') has (i) filed a certificate of incorporation for the Corporation on August 9, 2021; (ii) appointed Matthew Morgan and Matthew Attalla as the initial Directors; and (iii) adopted the Bylaws of the Corporation."

47.     The Founding Parties also caused BOXR Inc. to form BOXR Gym on August 18, 2021.

48.     BOXR Gym is wholly owned by BOXR Inc.

49.     Once again, Morgan and Attalla signed an operating agreement for BOXR Gym (the "Gym Operating Agreement"), in their capacity as directors of BOXR Inc. (which served as the sole "Member" and "Manager" of BOXR Gym).

50.     After BOXR Inc. and BOXR Gym were formed, Attalla sent an email to John King (an associate of Morgan), indicating that he intended to conduct the Joint Venture's operations under BOXR Gym:

> Boxr gym is registered which is great. I'm setting up the new [point of sale] system now. To get it ready with ABC. Which info do I put in to set it up because I was going to do it under the registered llc I'm using currently which is BOXR studios. But moving forward want to use BOXR gym.

51.     At this same time, the Founding Parties caused BOXR Inc. to register the Mark with the USPTO.

52.     Attalla and Morgan both coordinated with BOXR Inc.'s intellectual property counsel, Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins"), to register the Mark under BOXR Inc.'s name.

24

53.     Attalla was fully aware of, and agreed with, the decision to register the BOXR Mark under BOXR Inc.

54.     Thus, on August 19, 2021, BOXR Inc. caused Nelson Mullins to submit its application with USPTO for the Mark.

55.     In or around the same time-period (*i.e.*, August 2021), the Founding Parties began looking for a new property to locate the Gym, as the space Attalla was operating in was too small to scale the business.

56.     After identifying a new location (*i.e.*, the Property), Morgan led negotiations for the Lease with Gypsy K, LLC (the "Landlord").

57.     The Property was a 15,041 square foot abandoned warehouse situated in an ideal location, just off the MacArthur Causeway to Miami Beach and surrounded by residential buildings.

58.     Attalla was fully aware of, and consented to, the Lease negotiations being led by Morgan.

59.     On August 30, 2021, BOXR Gym and Landlord executed the Lease.  Both Morgan and Attalla signed on behalf of BOXR Gym in their capacities as Directors of BOXR Inc. and initialed every page of the Lease.

60.     In addition, Morgan signed a personal guaranty for BOXR Gym's obligations under the Lease.

*Attalla Expresses Concerns About His Citizenship Status*

61.     Soon after forming BOXR Inc., the Founding Parties started working to memorialize the Joint Venture.

62.     Among other things, the Founding Parties took steps to prepare a shareholder agreement for BOXR Inc.

63.     At the eleventh hour, Attalla belatedly informed the Majority Partners that he could not sign the employment agreement because he did not have authorization to work in the United States.  In addition, Attalla told the Majority Partners that he could be deported if he was identified in any formation documents.

64.     Attalla, therefore, requested that the Founding Parties hold off on the finalization of any further formation documents until he could resolve his immigration status.

65.     To accommodate Attalla's concerns, the Majority Partners agreed to hold off on finalizing the formation documents for the Joint Venture.

66.     However, the Founding Parties agreed that they needed an entity to hold BOXR Gym and the pending application for the Mark.

67.     Thus, shortly thereafter, the Founding Parties (including Attalla) decided to change the holding company for the Lease and the Gym (via BOXR Gym) from a corporation to a limited liability company to obtain certain tax benefits.

68.     Accordingly, the Founding Parties set up BOXR Holding.

69.     In December 2021, the Founding Parties registered BOXR Holding as a Delaware limited liability company.

70.     Given Attalla's concerns about his citizenship status, Attalla would not be named as an owner or member of BOXR Holding.

71.     Rather, Morgan (through his Trust) was initially identified as the sole owner, and Cambridge later became a member such that the Trust and Cambridge each held fifty percent (50%) of BOXR Holding.

26

72.     Everyone, including Attalla, agreed that nothing would change with respect to the Founding Parties' equity and agreement to form the Joint Venture.

73.     Consistent with this, Attalla remained the CEO of the Joint Venture.

74.     After forming BOXR Holding, Morgan – with Attalla's blessing - caused BOXR Inc. to transfer (or assign) (i) the pending application for the Mark to BOXR Holding, and (ii) the membership interests in BOXR Gym (which is the tenant under the Lease) to BOXR Holding.

75.     Shortly thereafter, BOXR Inc. was dissolved.

*The Founding Parties Work Together to Build, and Develop Business for, the Gym*

76.     After the transfer to BOXR Holding, the Founding Parties focused their attention on growing the BOXR business and developing the Gym at the Property.

77.     At all times relevant thereto, Attalla acted as the CEO of the Joint Venture, and the Majority Partners provided necessary capital and corporate know-how.

78.     Much of the funding provided by the Majority Partners went to the build-out of the Property/Gym.

79.     In addition, Attalla frequently asked the Majority Partners to attend meetings with key potential clients/partners as "the money guy[s] for BOXR."

80.     For example, the Majority Partners led negotiations on the Joint Venture's behalf in a deal with Floyd Mayweather.

81.     Attalla also repeatedly acknowledged – in writing – that the Joint Venture's success was the result of a group effort.

82.     Attalla would also request additional fund advancements from the Majority Partners to show potential clients/partners (certain of which had requested proof that the Joint Venture had capital).

27

83.     Because the Majority Partners were owners of the Joint Venture, they provided this funding as "equity" without formal terms or documentation.

84.     The Majority Partners also routinely guaranteed the Gym's payment obligations.

85.     In fact, in addition to Morgan's personal guaranty of the Lease, Morgan and Bridgman executed millions of dollars' worth of personal guarantees to guaranty the Gym's obligations under multiple equipment leases.

86.     As shown by their conduct, at all times relevant hereto the Majority Partners expected that they were equity owners of the Joint Venture and that they would be entitled to a share of whatever profits the Joint Venture made.

87.     On or around April 11, 2022, the Gym opened for business at the Property.

88.     The Majority Partners took an active role in soliciting new clients for the Gym.

89.     In addition, Morgan provided Attalla access to his team of professionals so that Attalla could use their experience and organizational structure to develop the BOXR business.

*Attalla Again Cites his Citizenship Status as a Concern and Declines to Formalize the Joint Venture*

90.     In the summer of 2022, the Majority Partners renewed their efforts to memorialize the Joint Venture by circulating proposed definitive documents to Attalla.

91.     Once again, Attalla refused to sign due to his stated uncertain immigration status.

92.     And once again, the Majority Partners agreed to hold off on memorializing the Joint Venture.

93.     Even without the formal documents, the Founding Parties continued to operate the Joint Venture together as co-venturers.

94.     To that end, the Founding Parties still worked together to improve the Gym, attended meetings with potential high-profile clients/partners, and marketed the Gym.

28

95.     For example, in August 2022, Attalla and Jonthan Calvo (the Joint Venture's employee at BOXR Gym, "Calvo"), worked together with Morgan to expand the BOXR business.

96.     In an email dated August 6, 2022, Calvo and Attalla proposed "a plan Mateo and [Calvo] came up with to be able to expand the business".

97.     In this email, Calvo and Attalla sought Morgan's advice and stated they "would love to create a win-win situation to expand the gym to reach the levels we foresee but also give you back the distributions that you deserve."

98.     Of course, Morgan would only be entitled to "distributions" as an equity owner of the Joint Venture (which he, along with Cambridge, were).

99.     On August 29, 2022, Morgan emailed Attalla, Bridgman, and Cambridge's CFO suggesting that the ownership group start to have monthly meetings to "cover updates, milestones, building a new financial model, goals, etc."

100.    Morgan went on to say that he "look[s] forward to running BOXR up as the dominant force in fitness and beyond with all of you."

101.    Attalla responded the next day and stated:

> Thanks Matt, i think that's a great idea. We can implement to have a scheduled call once a month where Jonathan and myself can give you guys an update and break down on the financials, as you guys are the investors and we are obligated to do so, i want to show you guys the fruitfulness of your investment in my brand. We really want to show you how far we can scale the brand to its fullest potential.
>
> Having the participation from you guys is tremendous value and i appreciate it a lot. I'm really excited to take BOXR to the next level with you guys, worldwide.
>
> Again thank you for always supporting, believing in the work we are putting in and seeing the vision. Together we are here to takeover.

29

102. Once again, Attalla's choice of words is telling. Indeed, by describing the Majority Partners as "investors" and by indicating that he intended to show them "the fruitfulness of [their] investment," Attalla confirmed (at least implicitly) that he viewed the Majority Partners to be "equity owners" of the Joint Venture.

103. On November 1, 2022, the USPTO granted BOXR Holding's application for the Mark.

104. But the Joint Venture started experiencing certain issues due to the lack of any formal documentation memorializing the Joint Venture.

105. For example, the Joint Venture attempted to lease certain, additional gym equipment from ABC Fitness Solutions, LLC ("ABC") for BOXR Gym. ABC, however, notified Calvo that (i) the initial leases were signed by Attalla through BOXR Studios, and (ii) new leases could not be processed without documentation explaining Attalla's role.

106. Attalla, however, had still refused to document his role in the Joint Venture. As Morgan explained to ABC via email (in an email including Calvo), "Mateo has never owned part of the [LLC] as he is not a US citizen. He will get ownership later when he gets his green card."

*As the Joint Venture's Business Grows, Attalla Suddenly Begins to Disclaim the Joint Venture*

107. The Founding Parties' efforts to create and develop the Joint Venture were beginning to have significant success.

108. And while Attalla previously acknowledged that Morgan and Bridgman/Cambridge were "investors" who had provided the Joint Venture with the capital it needed to experience such success, Attalla's view of the Majority Partners suddenly shifted.

109. Indeed, rather than distributing the profits to the Founding Parties pro rata, Attalla kept all profits generated from the Gym's operation to himself.

30

110.    Even worse, Attalla denied that the Joint Venture ever existed.  In fact, Attalla pointed to the absence of any executed agreement memorializing the Joint Venture as support for his claim.

111.    Of course, the Majority Partners only agreed to proceed without executed agreements at Attalla's repeated requests due to his alleged citizenship concerns.

112.    Upon information and belief, Attalla's stated citizenship concerns were, at best, disingenuous, and at worst, false when made.

113.    Given Attalla's conduct, the Majority Partners were frustrated, especially in light of everything that they had given to the Joint Venture, including Morgan and Bridgman's personal guarantees (only to be told that they did not have any ownership interest in the business).

114.    Thus, the Majority Partners attempted to reach a business divorce with Attalla.

115.    In June 2023, the Attalla Parties began making payments to the Majority Partners but ultimately ceased doing so and have failed to give the Majority Partners the distributions to which they are rightfully entitled.

116.    Attalla is also denying that the Majority Partners are co-owners of the Joint Venture and refusing to award them their rightful ownership in the Joint Venture.

117.    Tellingly, others have accused Attalla of similar improper conduct.

118.    Meanwhile, due in large part to the contributions and investments of the Majority Partners, the Gym has grown substantially.

119.    Upon information and belief, the Gym now has at least 3,000 members paying $199 a month for their membership.

120.    Of course, the Attalla Parties continue to improperly keep all of the Gym's profits to themselves, in bad faith.

31

## COUNT I: DECLARATORY JUDGMENT
### (Against the Attalla Parties)

121.   Counterclaim-Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

122.   At all relevant times, the Majority Partners sought to profit jointly with Attalla by developing and growing the BOXR business, referred to herein as the Joint Venture.

123.   In 2021, the Founding Parties formed the Joint Venture to grow and develop the BOXR business.

124.   Indeed, the Founding Parties caused the Joint Venture to apply for – and receive – the Mark, with Attalla's full knowledge and consent.

125.   The Founding Parties shared a community of interest in the performance of the BOXR business and Joint Venture.

126.   The Founding Parties exercised joint control, or had a right to exercise control, over the BOXR business and Joint Venture.

127.   The Founding Parties had a right to share in the profits and a duty to share in the losses of the BOXR business and Joint Venture.  Specifically, Morgan (through the Trust) and Bridgman (through Cambridge) each owned thirty percent of the Joint Venture, and Attalla owned the remaining forty percent.

128.   Counterclaim-Plaintiffs and the Attalla Parties, as co-venturers, exercised joint control over the Joint Venture, including by virtue of the following actions:

   a.   Registering the relevant entities;

   b.   Coordinating trademark applications;

   c.   Managing the BOXR point of sale service;

   d.   Retaining and promoting clients; and

32

e.   Negotiating deals with vendors.

129.   Attalla acknowledged that the Majority Partners were equity investors.   For example, Attalla acknowledged that the majority partners were (i) entitled to "distributions," (ii) "investors" in the BOXR business, and (iii) entitled to the "fruitfulness" of the BOXR brand.

130.   Notwithstanding Attalla's prior acknowledgment, he subsequently claimed that the Majority Partners are not equity investors.

131.   By virtue of the foregoing, a bona fide and actual controversy exists between Attalla and Counterclaim-Plaintiffs, because Counterclaim-Plaintiffs claim, and the Attalla Parties deny, that (i) the Joint Venture exists, and (ii) the Joint Venture rightfully owns the Mark.

132.   The Founding Parties have no other recourse for relief, and a judicial determination of the creation of the Joint Venture, and its ownership of the Mark, is necessary to avoid inflicting further harm on Counterclaim-Plaintiffs

133.   For the reasons set forth above, Counterclaim-Plaintiffs should be granted a declaratory judgment against the Attalla Parties confirming that (i) the Founding Parties formed the Joint Venture, (ii) the Joint Venture owns the Mark, (iii) the Majority Partners collectively own 60% of the Joint Venture, (iv) the Majority Partners are entitled to a proportional share of the Joint Venture's profits, and (v) compelling the Attalla Parties to transfer the Majority Partners' their pro rata share of the Joint Venture's profits.

## COUNT II: BREACH OF FIDUCIARY DUTY
### (Breach of Fiduciary Duty Claim on Behalf of the Joint Venture Against Attalla)

134.   Counterclaim-Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

135.    Morgan, through the Trust, and Cambridge assert this claim derivatively on behalf of the Joint Venture, as any demand on Attalla would be futile due to his repeated claims that the Joint Venture does not exist.

136.    Attalla is the CEO of the Joint Venture.

137.    As the CEO of the Joint Venture, Attalla owes fiduciary duties to the Joint Venture.

138.    These fiduciary duties include the highest obligation of loyalty, fairness, candor, and due care.

139.    Attalla breached the fiduciary duties by, *inter alia*, (i) retaining the profits of the BOXR business for himself, (ii) disclaiming any formal business relationship with the Majority Partners, and (iii) upon information and belief, competing with the Joint Venture by setting up unauthorized entities without the Majority Partners' knowledge or consent and housing the Joint Venture's assets in those entities.

140.    These actions were all in bad faith.

141.    Even worse, upon information and belief, Attalla has since "sold" the Majority Partners' stake in the Joint Venture without the Majority Partners' knowledge or consent.

142.    By reason of the foregoing, Counterclaim-Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than $25 million.

## COUNT III: BREACH OF FIDUCIARY DUTY
**(Breach of Fiduciary Duty Claim Against Attalla)**

143.    Counterclaim-Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

144.    Attalla is the CEO, and a member of the Joint Venture.

145.    Attalla owes fiduciary duties to the Majority Partners.

34

146.   These fiduciary duties include the highest obligation of loyalty, fairness, candor, and due care.

147.   Attalla breached the fiduciary duties by, *inter alia*, denying the Majority Partners their rightful equity in the Joint Venture, and keeping to himself all monies stemming therefrom.

148.   These actions were all in bad faith.

149.   These actions have obstructed the Majority Partners' receipt of the profits of the BOXR business.

150.   Even worse, upon information and belief, Attalla has since "sold" the Majority Partners' stake in the Joint Venture without the Majority Partners' knowledge or consent.

151.   By reason of the foregoing, Counterclaim-Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than $25 million.

### COUNT IV: FRAUD
**(Against the Attalla Parties)**

152.   Counterclaim-Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

153.   As Attalla readily admits, in 2021, Attalla solicited investments from the Majority Partners under the auspices of forming a joint venture.

154.   To solicit their investment, Attalla made several material representations to the Majority Partners, including that (i) he intended to form the Joint Venture, (ii) the Majority Partners would collectively own 60% of the BOXR business, and (iii) certain issues with Attalla's immigration status left him vulnerable to deportation if formal documentation were executed.

155.   Upon information and belief, these statements were knowingly false when made.

156.   Indeed, Attalla never intended to grant the Majority Partners their promised equity.

157. Attalla's plan is now clear: he said whatever it took to induce the Majority Partners to invest significant capital to grow the BOXR business and brand.

158. At the same time, Attalla refused to sign agreements based upon concerns with his immigration status.

159. Upon information and belief, there was no issue with Attalla's immigration status, and Attalla only cited these "concerns" as pre-text to avoid signing formal documents.

160. In fact, Attalla used the absence of executed agreements to suggest that the Majority Partners were not equity owners of the Joint Venture.

161. Attalla made his false representations with the intention of inducing the Majority Partners into relying on them.

162. The Majority Partners reasonably relied on Attalla's false representations to their detriment.

163. By reason of the foregoing, Counterclaim-Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT V: UNFAIR COMPETITION
### (Against the Attalla Parties)

164. Counterclaim-Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

165. Section 501.204(1), Florida Statutes, provides that "[u[nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful".

166. Section 501.211(2), Florida Statues, provides that "[i]n any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs".

36

167. The Founding Parties formed the Joint Venture for the purpose of growing and developing the BOXR business.

168. The Joint Venture owns the BOXR business's assets including BOXR Gym, the Lease, and the Mark.

169. Notwithstanding his membership in the Joint Venture, and his status as CEO, Attalla falsely and/or deceptively created numerous other entities bearing the BOXR name and using the BOXR Mark, while making promises to other, undisclosed third parties concerning ownership of these entities, without the consent or approval of the Majority Partners nor the Joint Venture.

170. Indeed, the Attalla Parties are competing with the Joint Venture by setting up these unauthorized entities without the Majority Partners' knowledge or consent and holding assets rightfully belonging to the Joint Venture in these other, improper entities.

171. Attalla's creation of numerous other BOXR entities, and his use of the BOXR Mark, causes confusion because prospective and current clients conduct business with Attalla's improper entities, believing them to be legitimately part of the BOXR business.

172. By reason of the foregoing, Counterclaim-Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than $25 million, and are entitled to their reasonable attorneys' fees and costs.

### COUNT VI: CONVERSION
### (Against the Attalla Parties)

173. Counterclaim-Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

174. Despite the Founding Parties' agreement to form the Joint Venture, Attalla has refused to acknowledge the Majority Partners' 60% equity in the Joint Venture, holding such equity (and the proceeds flowing therefrom) hostage.

175. Indeed, the Attalla Parties have kept all profits from operating the Joint Venture to themselves.

176. In so doing, Attalla and/or BOXR Studios have converted the Joint Venture's profits.

177. These acts by Attalla were *ultra vires* and constituted conversion of Counterclaim-Plaintiffs' property.

178. By reason of the foregoing, Counterclaim-Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than $25 million.

## COUNT VII: UNJUST ENRICHMENT
### (Against the Attalla Parties)

179. Counterclaim-Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

180. The assets of the BOXR business are jointly owned by the Joint Venture.

181. Indeed, the Joint Venture acquired these assets by virtue of the Majority Partners' considerable investment in the BOXR business.

182. The Attalla Parties have failed to share the profits of the Joint Venture with the Majority Partners and instead retained those profits for themselves.

183. The Attalla Parties are also improperly holding the Majority Partners' equity in the Joint Venture hostage.

184. Accordingly, the Attalla Parties have been unjustly enriched, and Counterclaim-Plaintiffs have been correspondingly damaged, in an amount to be determined at trial, but in no event less than $25 million.

185. Equity and good conscience forbid the Attalla Parties retention of the benefits of the Majority Partners' investment without providing adequate compensation to them.

## COUNT VIII: ACCOUNTING
### (Against the Attalla Parties)

186. Counterclaim-Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

187. Attalla was entrusted with, and has possession of, business records and funds in which the Majority Partners have an interest.

188. Attalla has disregarded corporate formalities in maintaining these business records and has instead weaponized his position of authority for personal gain.

189. The Attalla Parties have refused to deliver these business records for inspection.

190. Accordingly, Counterclaim-Plaintiffs seek to compel the Attalla Parties to account for the BOXR business's assets, in which the Majority Partners have an interest, so that Counterclaim-Plaintiffs can determine how the Attalla Parties' misconduct has harmed, and diminished the value of their interest in, the Joint Venture.

## PRAYER FOR RELIEF

**WHEREFORE**, Counterclaim-Plaintiffs pray for judgment against the Attalla Parties as follows:

i. On Count One, declaratory judgment (a) confirming (i) the existence of a Joint Venture, (ii) that the Joint Venture rightfully owns the Mark, and (iii) the Majority Partners' entitlement to (x) their equity in the Joint Venture, and (y) to their pro rata share

39

of the Joint Venture's profits, and (b) for an order compelling the Attalla Parties to transfer to the Majority Partners their rightful equity in the Joint Venture, and all proceeds stemming therefrom;

ii.    On Count Two, monetary damages in an amount to be determined at trial, but in no event is less than $25 million;

iii.    On Count Three, monetary damages in an amount to be determined at trial, but in no event less than $25 million;

iv.    On Count Four, monetary damages in an amount to be determined at trial;

v.    On Count Five, monetary damages in an amount to be determined at trial, but in no event is less than $25 million;

vi.    On Count Six, monetary damages in an amount to be determined at trial, but in no event is less than $25 million;

vii.    On Count Seven, monetary damages in an amount to be determined at trial, but in no event is less than $25 million;

viii.    On Count Eight, an accounting of the Joint Venture;

ix.    Costs and expenses, including reasonable attorneys' fees;

x.    Punitive damages; and

xi.    Whatever additional relief this Court deems just and proper.

Dated: July 21, 2025

By: */s/ Jeffrey E. Marcus*
Jeffrey E. Marcus
Fla Bar No. 310890

**MARCUS NEIMAN RASHBAUM &
PINEIRO LLP**
2 South Biscayne Boulevard, Suite 2530
Miami, Florida 33131

40

T: (305) 400-4262
jmarcus@mnrlawfirm.com


**FEUERSTEIN KULICK LLP**

By: */s/ David Feuerstein*
David Feuerstein *pro hac forthcoming*
William Travis *pro hac forthcoming*
Christopher Alexander *pro hac forthcoming*
420 Lexington Avenue, 20th Floor
New York, New York 10170
646-768-0591
david@dfmklaw.com
william@dfmklaw.com
calexander@dfmklaw.com

*Attorneys for Counterclaim-Plaintiffs*

41